# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CASE NO.:

| | |
|---|---|
| Hal Wright ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | |
| ) | **COMPLAINT FOR DAMAGES,** |
| Stokes County Board of Education ) | **DECLARATORY, EQUITABLE,** |
| and Surry County Board of ) | **AND INJUNCTIVE RELIEF** |
| Education ) | |
| ) | |
| DEFENDANTS. ) | |
| ) | |

## **PRELIMINARY STATEMENT**

1.     Plaintiff Hal Wright files this Complaint against Defendants for unlawful conduct against him, in violation of the First and Fourteenth Amendments of the United States Constitution.

2.     Defendants, by and through persons acting under color of state law, deprived Plaintiff of his federal constitutional right to due process in violation of 42 U.S.C. § 1983.

## **JURISDICTION AND VENUE**

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil

1

actions arising under the Constitution, laws, and treaties of the United States.

4. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a), which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

5. This is an action arising under the laws of the United States and an action by Plaintiff, who is aggrieved by the actions and inactions of Defendants.

6. Plaintiff brings this action to redress deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

7. Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendant Boards are located within the Middle District of North Carolina, and a

2

substantial part of the acts or omissions giving rise to this complaint arose from events occurring within this judicial district.

8. This Court has the authority to enter a declaratory judgment and to provide permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; 28 U.S.C. §§ 2201 and 2202.

9. This Court has the authority to award damages for these violations pursuant to 42 U.S.C. § 1983.

## APPLICABLE LAW AND POLICY

10. The First Amendment of the United States Constitution states "Congress shall make no law. . . abridging the freedom of speech . . . or the right of the people to peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "States are precluded from abridging the freedom of speech . . . by force of the due process clause of the Fourteenth Amendment." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244, 56 S. Ct. 444, 446, 80 L. Ed. 660 (1936).

11. Pursuant to 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the

3

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

12. The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws" or "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

13. "[M]unicipalities have no immunity from damages liability flowing from their constitutional violations[.]" *Owen v. City of Independence, Mo.*, 445 U.S. 622,657, 100 S.Ct. 1398, 1418 (1980).

14. A plaintiff is entitled to the full range of relief available under 42 U.S.C. § 1983, including nominal damages, compensatory damages, and declaratory and injunctive relief. *See, e.g., Uzuegbunam v. Preczewski*, 592 U.S. 279, 290 (2021) (nominal damages); *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 307 (1986) ("[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . . , personal humiliation, and mental anguish and suffering.") (internal quotation marks omitted) (ellipsis in original); *Knussman v. Maryland*, 272 F.3d 625, 639-41 (4th Cir. 2001) (damages for emotional distress and mental anguish are

4

recoverable under Section 1983 where the harm is caused by the constitutional deprivation.)

15. All official meetings of public bodies are open to the public in North Carolina. N.C. Gen. Stat. § 143-318.10. Defendants' regularly scheduled meetings are "official meetings" and open to the public. N.C. Gen. Stat. § 115C-4.

16. "Visitors are invited to attend school events that are open to the public, such as athletic events, musical programs, and dramatic productions." Stokes County Board Policy 5020 – Visitors to the Schools, Section A(3); Surry County Board Policy 5020 – Visitors to the Schools, Section A(3).

17. Policy 5020 provides a singular limitation: "The superintendent, upon recommendation from the principal, may deny an individual permission to come onto school grounds or enter a school facility for up to one school year if the individual is guilty of disruptive or dangerous behavior on school grounds." Policy 5020 Section D.

## **PARTIES TO THE COMPLAINT**

18. PLAINTIFF Hal Wright resides at 1045 Johnstown Road, Westfield, North Carolina, and is a longstanding member of the Mount Airy, Stokes County, and Surry County communities. At all times relevant to this action, Plaintiff has been a resident of Stokes County, North Carolina.

5

19. DEFENDANT SURRY COUNTY SCHOOLS BOARD OF EDUCATION ("Surry BOE") is a local board of education with general control and supervision of all matters pertaining to its respective administrative units and enforces the school law in its respective units. N.C. Gen. Stat. § 115C-36. As a local governmental unit, Surry BOE is a "person" as defined by 42 U.S.C. § 1983 (2000). Surry BOE is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

20. DEFENDANT STOKES COUNTY SCHOOLS BOARD OF EDUCATION ("Stokes BOE") is a local board of education with general control and supervision of all matters pertaining to its respective administrative units and enforces the school law in its respective units. N.C. Gen. Stat. § 115C-36. As a local governmental unit, Stokes BOE is a "person" as defined by 42 U.S.C. § 1983 (2000). Stokes BOE is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

21. DEFENDANTS Surry BOE and Stokes BOE (hereinafter "Defendants" or "Defendant Boards") are the corporate bodies that hold all school property and are capable of prosecuting and defending suits for or against the corporation. N.C. Gen. Stat. § 115C-40.

22. DEFENDANTS elect superintendents and prescribe their duties. N.C. Gen. Stat. § 115C-47(13), (15). Superintendents have the duty to carry

6

out all rules and regulations of the board. *Id.* - § 115C-276(a). Superintendents are the "executive officers" of the school district. *Id.* - § 115C-5(8).

## FACTUAL ALLEGATIONS

23. Plaintiff Hal Wright is a longstanding member of the Mount Airy, Stokes County, and Surry County communities. For many years, Mr. Wright has been actively involved in supporting local public school athletic programs. He regularly attended school-sponsored athletic events and other school activities and contributed time and resources to student athletics.

24. Mr. Wright served as a volunteer coach for youth sports programs through the local YMCA, where he was the head coach for multiple sports, including basketball, soccer, and baseball, mentoring numerous children in the community, including his own. Mr. Wright also coached a coeducational travel soccer team, regularly accompanying players to competitions throughout North Carolina, including in Boone, and serving as a lead chaperone during these events. In addition, Mr. Wright is a certified soccer referee and has officiated youth, high school, and collegiate-level games across the region.

7

25. Throughout his extensive involvement in community and school-related athletics, Mr. Wright has never been the subject of any complaint, disciplinary action, or concern. To the contrary, he has been widely known, respected, and trusted by families, students, and community members alike. Through these efforts, Mr. Wright fostered community engagement and supported youth development within the public school systems.

26. Mr. Wright raised his family, including his sons and grandchildren, in the community and has consistently sought to instill values associated with youth athletics, including hard work, respect, and community service. In furtherance of these efforts, Mr. Wright supported school athletic programs through sponsorships, providing transportation for athletes, financial contributions for team meals and banquets, and, at times, gifts to student-athletes.

27. Mr. Wright regularly attended school-sponsored athletic events in Mount Airy, Stokes County, and Surry County to support local student-athletes, including his grandchildren. At these events, he wore hats and shirts with the Mount Airy mascot and openly expressed his support through cheering, applauding, and engaging with other members of the school community. Mr. Wright regularly interacted with fellow

8

spectators and families, offering encouragement and support to the teams, student-athletes, and game officials alike. Through this conduct, Mr. Wright conveyed, and the audience of other members of the community would understand, his messages of encouragement, school pride, support for public school athletic programs and athletes, and participation in community life, all forms of expressive activity and assembly protected by the First Amendment.

28. In Winter 2019, consistent with his prior support of student-athletes, Mr. Wright anonymously provided a student-athlete with several gifts (e.g., sunglasses, jewelry, headphones, and clothing) in recognition of the student's athletic performance that mirrored gifts provided to his family members. The student's family reported these gifts to law enforcement presumably believing they were sent with a nefarious purpose.

29. When law enforcement questioned Mr. Wright, he immediately admitted to sending the gifts and explained the magnanimous spirit with which he sent them.

30. Mr. Wright had no contact and did not attempt to make any contact with the student after being informed by law enforcement of the misinterpretation of his motive for sending the anonymous gifts.

9

31. Detective Ashley Doiel of the Surry County Sheriff's Office led the investigation, and, upon information and belief, communicated regularly with Shannon Phipps, the student's mother.

32. On December 17, 2020, Mr. Wright was charged with misdemeanor stalking, which the prosecutor subsequently deferred. The District Attorney dismissed the charge on January 9, 2025, and the charge was subsequently expunged from the public record on March 10, 2025.

33. After the charges were initially filed, Shannon Phipps, filed for a civil no-contact order against Mr. Wright. As Mr. Wright had no intention of contacting the student and wished to avoid protracted litigation, Mr. Wright consented to the entry of the order with no findings of fact. On February 9, 2023, Mr. Wright agreed to extend the order, which ultimately expired on February 9, 2025.

34. In a gesture of his sincere regret for any discomfort the Family experienced by the receipt of his gifts and to cover all legal or medical fees the Family may have incurred, Mr. Wright sent the family a financial gift intended as an apology for any misunderstanding, which the Family accepted without any consideration. No written or verbal agreement was executed between Mr. Wright and the family, and the

10

payment was not intended as a settlement or admission of wrongdoing, but simply as a gesture of goodwill.

35. Upon information and belief, in September 2022, Detective Doiel contacted Surry BOE Superintendent Travis Reeves and Mount Airy City Schools Superintendent Kim Morrison to inform them she received a complaint that Mr. Wright had spoken to a different student at a junior varsity sporting event at Surry Central High School on September 1, 2022.

36. Mr. Wright did not attend any sporting event on September 1, 2022, at Surry Central High School and, thus, never spoke to the unidentified student. Detective Doiel, nor any member of the Surry County Sheriff's Department, informed Mr. Wright about the alleged report from the unidentified student much less questioned Mr. Wright.

37. Upon information and belief, Detective Doiel did not investigate this report prior to contacting Superintendents Reeves and Morrison. Chief Deputy Larry Lowe of the Surry County Sheriff's Department later confirmed the complaint was "not substantiated."

38. On September 19, 2022, Superintendent Reeves, "[a]s Superintendent of the Surry County Schools," sent Mr. Wright a letter via hand delivery on official letterhead with the subject line: "**PROHIBITION FROM**

11

**PRESENCE ON SCHOOL PROPERTY AND FROM CONTACT WITH STUDENTS AND/OR STAFF.**" (Emphasis in original).

39. The letter imposed a blanket ban prohibiting Mr. Wright from having "any contact or communication whatsoever with any Surry County Schools student or staff member, excluding members of [his] immediate family, until further notification from [Superintendent Reeves]."

40. The letter further prohibited Mr. Wright from entering <u>any</u> campus within the Surry County Schools administrative unit, from being present on <u>any</u> public-school property, and from attending <u>any</u> function or event involving Surry County Schools.

41. Superintendent Reeves imposed "the sanction as a result of [Mr. Wright's] *recent* conduct in which you have contacted, or have attempted to contact, student *via* the internet or other forms of communication; have sent, or have tried to send, gifts to students; and have exhibited otherwise inappropriate conduct toward students and/or staff."

42. The letter informed Mr. Wright the ban was indefinite in duration and the authority to rescind the ban within the sole discretion of the Superintendent, and law enforcement would be notified immediately, and "we shall pursue all available legal remedies, including the issuance of an appropriate criminal warrant or citation."

43. Superintendent Reeves copied the Honorable Steve C. Hiatt, Sheriff of Surry County on the letter.

44. Prior to issuing the September 19, 2022, ban, Surry BOE made no effort to contact Mr. Wright, notify him of the allegations against him, or provide him with any opportunity to respond. At no point before imposing this sweeping exclusion did Surry BOE seek Mr. Wright's account of any events or allow him to present his side of the story. Instead, Surry BOE unilaterally imposed a system-wide ban removing his right to access these public facilities and properties for any purpose. Surry BOE imposed the ban without notice of the alleged conduct, identifying any policy or law Mr. Wright violated, without investigation that included Mr. Wright's input, and before affording him any opportunity to be heard.

45. The following day, September 20, 2022, Detective Doiel then emailed members of law enforcement and school officials, including the Superintendent of Mount Airy City Schools, a copy of the September 19, 2022, letter issued by Superintendent Reeves informing law enforcement and school officials Mr. Wright "has been banned from all Surry County School Property and Mount Airy School Properties."

13

46. Detective Doiel's email indicated a complaint had been received from a student at Surry Central High School during a junior varsity sporting event and asserted Mr. Wright had been observed at other school events. Upon information and belief, no formal investigation into this alleged complaint was conducted prior to or after sending the email and as explained *supra*, Chief Deputy Lowe confirmed the complaint was "not substantiated."

47. Detective Doiel's email included pictures of Mr. Wright and asked to be contacted "[i]f anyone has contact with him on school property."

48. Plaintiff first learned of this email when he received documents from Mount Airy City Schools in response to a public records request in 2025. Prior to receiving the documents, Plaintiff had no knowledge of the "recent" behavior of which he was accused.

49. Upon information and belief, Detective Doiel sent a similar email with Mr. Wright's pictures to law enforcement and school officials in Stokes County Schools and Surry County Schools.

50. On September 21, 2022, Superintendent Phillip Bradley ("Brad") Rice of Stokes County Schools sent a letter also via hand delivery that imposed a blanket ban, copied verbatim from Superintendent Reeves's September 19, 2022, letter. The Stokes BOE letter included the same prohibitions

of having "any contact or communications whatsoever with any Stokes County Schools student or staff member" and banned Mr. Wright from all campuses and public-school property within the Stokes County system and from attending "any function or event (including athletic or other extracurricular events")." Superintendent Rice's letter likewise threatened legal repercussions and copied Joey Lemons, Sheriff of Stokes County.

51. Stokes County Schools likewise imposed this ban removing Mr. Wright's access to public facilities and properties for any reason without notifying Mr. Wright of the alleged conduct, identifying any policy or law he violated, before affording him any opportunity to respond. At no point prior to issuing the ban did Superintendent Rice or any representative of Stokes BOE seek Mr. Wright's account of events, or conduct any process that included his participation; instead, they unilaterally imposed ban from speaking with any Stokes County students or staff and a system-wide exclusion from all facilities and properties under threat of criminal enforcement.

52. Collectively, these bans arose from the unsubstantiated report from an identified source on September 1, 2022, and possibly the alleged action of sending anonymous gifts that precipitated the December 2020

15

misdemeanor stalking charge that, as noted *supra*, was later dismissed and expunged.

53. Mr. Wright was never informed of the unsubstantiated complaint on September 1, 2022, and was never questioned by law enforcement or school officials.

54. Defendants' letters did not identify any policy, procedure, or administrative process by which Mr. Wright could challenge, appeal, or seek review of the bans imposed against him. The ban notices contained no information regarding available remedies, no timeline for reconsideration, and no standards governing how, when, or even if the bans could be lifted.

55. Shortly after Mr. Wright received these letters, a colleague, who was a referee at a sporting event on campus, contacted Mr. Wright advising him that he saw Mr. Wright's picture, posted by the Stokes BOE, in the school office for others to see in connection with these bans.

56. Due to the ban, Mr. Wright was unable to attend Defendants' public meetings to challenge the ban under threat of criminal prosecution, as the meetings are held on school properties.

57. Mr. Wright never violated the bans and worked diligently to prove his innocence to law enforcement and sought to have the charges dismissed.

58. As explained *supra*, the criminal charges were dismissed on January 9, 2025, and expunged from the public record on March 10, 2025, and the subsequent report was "unsubstantiated." Nonetheless, Defendants' bans remained in place.

59. Following the dismissal and expungement of the criminal charge, former counsel for Mr. Wright, Jay Vannoy, undertook efforts to have Defendants' bans lifted. On May 9, 2025, Mr. Vannoy wrote to the new Superintendent of Mount Airy City Schools, Phillip Brown, requesting rescission of the ban. Mr. Vannoy explained "Mr. Wright would like to be able to pick up his [three] grandchildren from school and attend his grandchildren's sporting events" and attend the sporting events for the school team his sons, Andrew and Daniel Wright, coached.

60. On July 2, 2025, Mr. Vannoy similarly contacted Defendants' Superintendents advising the underlying charge had been dismissed and expunged and requesting the bans be removed allowing Mr. Wright to be present on school properties and attend sports activities. Mr. Vannoy explained "Mr. Wright is an active supporter" of the school systems and provided a copy of the dismissal and expungement orders.

61. In response, Phillip Brown informed Mr. Wright's son they would "have to ask [the student] to see how she feels about this" before considering

17

whether to lift the bans. This response demonstrates Defendants' decision-making process was not grounded in any established policy affording appropriate procedural due process but instead relied on subjective considerations untethered to objective standards, Board policies, and State law.

62. On July 21, 2025, Superintendent Rice (Stokes County Schools) communicated with Superintendent Reeves (Surry County Schools) and Superintendent Brown, via email indicating he had spoken to Stokes BOE's attorney who indicated he would write a letter indicating Stokes BOE would remove the ban subject to certain conditions but desired "all three school districts take the same action."

63. Superintendent Reeves responded to Superintendents Rice and Brown and informed Superintendent Rice he had spoken a month earlier with Superintendent Brown, and Mount Airy City Schools was "going to keep the ban in place."

64. Superintendent Brown responded to the email, "Brad, this is complicated. Please call me when you get the chance."

65. On July 22, 2025, Superintendent Rice emailed Superintendents Brown and Reeves and Defendants' attorney and the attorney for Mount Airy City Schools thanking Superintendents Brown and Reeves for their

18

"input and guidance regarding the situation involving Hal Brent Wright and the ongoing campus ban related to the stalking concerns." He noted his appreciation of Superintendent Brown "providing additional information that [he] was not aware of."

66. Superintendent Rice agreed "we all need to be on the same page." He asked their respective Boards' attorneys to consult and "connect with the Mount Airy Police Chief as part of [their] review."

67. On August 22, 2025, Mount Airy City Schools formally refused to lift its ban, ratifying their original decision to ban Mr. Wright. Despite receiving the same information regarding the dismissal and expunction of the underlying charge, Surry County Schools and Stokes County Schools did not respond and took no action to reconsider or lift their respective bans.

68. On September 29, 2025, Mr. Wright sent a public records request under North Carolina law and the Freedom of Information Act (FOIA) to Mount Airy City Schools. Mount Airy City Schools' attorney responded on October 22, 2025, refusing to provide multiple records indicating the records were not "public records," but provided a copy of the September 20, 2022, correspondence from Detective Doiel and internal emails with Defendants' Superintendents.

19

69. Learning of the alleged incident in Detective Doiel's email, Mr. Wright and his sons contacted the Surry County Sheriff's Office to learn more about the allegations reported by Detective Doiel.

70. On November 7, 2025, Chief Deputy Larry Lowe of the Surry County Sheriff's Office provided written confirmation the complaint referenced in the September 20, 2022, email had not been substantiated, any investigation had been closed, and there were no active or ongoing investigations involving Mr. Wright. Chief Deputy Lowe further confirmed the Sheriff's Office had no record indicating Mr. Wright attended any athletic events in Surry County without authorization.

71. On November 12, 2025, undersigned counsel for Mr. Wright contacted Defendants, providing Chief Deputy Lowe's letter, reminded Defendants the 2020 charge had been dismissed and the record expunged, and, again, requested the bans be rescinded.

72. After receiving the November 12, 2025, letter, Superintendent Reeves met with Ms. Phipps and the now-adult student to whom Mr. Wright sent the gifts in 2020. Superintendent Reeves did not ask to meet with Mr. Wright.

73. Defendants permitted Ms. Phipps to submit materials from 2020 for the Boards' consideration prior to responding to Mr. Wright's second request

20

to lift the ban that included unsubstantiated hearsay, which, upon information and belief, Ms. Phipps obtained from Detective Doiel.

74. Defendants' counsel provided a courtesy copy of these materials to the undersigned counsel. These are the same materials that were considered by the District Attorney prior to dismissing the case and should have been destroyed pursuant to the expungement order.

75. Neither Board afforded Mr. Wright with a comparable opportunity to present information or respond to the allegations from 2020 or from the unsubstantiated report in 2022 or respond to any information solicited by the Boards from Ms. Phipps. Neither Board contacted Mr. Wright before making their determinations to uphold the bans.

76. Almost three (3) months later, on February 17, 2026, Surry and Stokes County Schools issued letters refusing to rescind the bans, thereby reaffirming and ratifying the original decision to exclude Mr. Wright from all school properties and related events and prohibit any contact between Mr. Wright and any Surry or Stokes County Board of Education staff member or student. As a result of these ongoing, indefinite bans, for more than three and a half (3.5) years Mr. Wright has been prohibited from attending his grandchildren's school events, including athletic competitions and award ceremonies, from entering school property for

21

routine purposes, such as attending a community event held on school property, and from attending Board of Education meetings to observe, participate, and petition his government.

77. These bans have excluded Mr. Wright from forums Defendants have opened to the public for community participation and have prevented him from engaging in core First Amendment activities, including speech, association, assembly, and petition.

78. Defendants' bans are not limited to physical presence on school campuses or attendance at school-sponsored events. On threat of criminal prosecution, the bans prohibit Mr. Wright from having any contact or communication whatsoever with any student or staff member associated with Surry County Schools or Stokes County Schools. The breadth of this prohibition is sweeping, extending far beyond any identifiable forum or school-controlled setting and into the fabric of everyday life within the community.

79. As applied, these restrictions impose an impossible burden on Mr. Wright. In order to comply, he would be required to possess comprehensive and constantly updated knowledge of all students and staff affiliated with both school systems—an ever-changing population spanning multiple counties, schools, and extracurricular activities. Any

22

inadvertent interaction, whether in a public place, at a community business, or in the course of ordinary daily activities, risks being construed as a violation subject to criminal enforcement. The bans thus function not as reasonable, forum-based limitations, but as a broad and indefinite restraint that exposes Mr. Wright to potential criminal sanctions based on unavoidable and unintentional conduct.

80. The practical effect of these bans has been to force Mr. Wright out of his own community. To avoid the risk of accidental violation, he has been compelled to alter his daily life—shopping for groceries outside his hometown, avoiding local restaurants, and steering clear of common gathering places where he might encounter students or school personnel. He must remain constantly vigilant, monitoring his surroundings and modifying his behavior to avoid even incidental contact. In effect, Defendants' actions have imposed a form of civil exclusion, depriving Mr. Wright of the ability to live freely within his community and participate in ordinary social and civic life.

81. As a direct result of Defendants' actions, Mr. Wright has suffered significant reputational harm within his community. Prior to and after the bans, Ms. Phipps disseminated derogatory and inflammatory comments on social media about Mr. Wright. Due to the absence of due

23

process, many members of the public have come to believe Mr. Wright engaged in serious and inappropriate misconduct involving a minor warranting his complete ban from school properties. His community members are aware of the ban, not only by the posting in the school office, but also by Mr. Wright's noticeable absence from all school events given that Mr. Wright was previously an avid supporter of school athletics and attended all athletic and school events of his grandchildren.

82. The bans perpetuate the reputational harm, and individuals have publicly labeled him a "sexual predator" and a "creep," and others have gone so far as to post his home address and issue threats against him online. These false perceptions have caused a marked deterioration in Mr. Wright's personal relationships and standing within the community where he was previously well known and respected. Individuals who once interacted with him regularly no longer do so. As a result, Mr. Wright has been forced to significantly alter his daily life by avoiding public gatherings, restaurants, and even local grocery stores, often traveling to other towns to minimize the risk of confrontation or harassment. He remains in a constant state of vigilance, taking steps to avoid individuals who have targeted him. For a retired individual whose

24

life was centered on family, community involvement, and social connection, these harms are profound, ongoing, and irreparable.

83. Mr. Wright remains unable to attend public meetings, which by law he is entitled to attend, and athletic and school-related events, which by Board policy he is entitled to attend. He is unable to engage with his community without fear of unknowingly interacting with a student or staff member of the Stokes and Surry County School District and risk incurring criminal sanctions as a result.

84. More importantly, as a direct and foreseeable result of Defendants' actions, Mr. Wright has been, and continues to be, excluded from some of the most significant and irreplaceable moments in his family's life. The blanket bans have barred and continue to bar him from attending his grandchildren's athletic events, school functions, and milestone occasions, including games, ceremonies, performances, and unless rescinded – their graduations.

85. Since the imposition of Defendants' bans, Mr. Wright has been excluded from approximately 57 school-related events involving his grandchildren, including athletic competitions and championship-winning performances, marking critical athletic and academic milestones. These are singular, defining moments in the lives of his

25

family members that Mr. Wright has been forced to miss and will never be able to recover. Each missed event represents a permanent and irreparable loss of familial participation, support, and shared experience. Moreover, this list is not static as it continues to grow week by week as Defendants' bans remain in place, compounding the harm and further depriving Mr. Wright of ongoing opportunities to engage with his family and community.

86. These are not ordinary or repeatable events; they are singular moments marking his grandchildren's growth, achievement, and development. These are all moments that grandparents do not get a second opportunity to witness. Each missed game, each missed ceremony, and each missed milestone is a loss that cannot be undone and is difficult, if not impossible, to remedy after the fact.

87. Defendants' actions have forced Mr. Wright to stand apart from his family and community during occasions specifically designed to bring them together. While other family members and community participants gather, celebrate, and support these children, Mr. Wright alone is excluded, unable to observe, participate in, or share in these defining experiences. The harm is immediate, ongoing, and within the discretion of his government to stop.

26

88. With each passing event, Mr. Wright is permanently deprived of memories, relationships, and shared experiences that form the foundation of family life.

89. These lost moments are, by their very nature, unrecoverable. No subsequent relief can restore Mr. Wright's presence at a missed game-winning play, a school performance, or a graduation ceremony. Defendants' continued enforcement of these bans therefore inflicts a continuing and compounding injury, depriving Mr. Wright not only of his constitutional rights, but also of the ability to participate in and bear witness to the lives of his grandchildren in real time.

## COUNT I

### Violations of the Fourteenth Amendment
### 42 U.S.C. § 1983

90. Plaintiff incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

91. The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws" or "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

27

92. Pursuant to 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

93. "Persons" acting under color of state law who violate the United States Constitution may be sued. Federal law, not state law, determines whether a governmental body qualifies as a "person" subject to suit under § 1983.

94. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

95. The Due Process Clause of the Fourteenth Amendment forbids arbitrary deprivations of liberty and requires the government to provide "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "Where a

28

person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006) (discussing the liberty interest in a person's reputation when charges are made against him "that might seriously damage his standing and associations in his community") (internal citations omitted).

96. "Local governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a . . . decision officially adopted and promulgated by that body's officers." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)).

97. Deprivations of constitutionally [and statutorily] protected rights may arise due to "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 691.

98. There are four (4) ways a policy or custom may give rise to liability under *Monell*:

29

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission . . . that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Starbuck,* 28 F.4th at 533 (citing *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)); *Oliver v. Baity*, 208 F. Supp.3d 681, 689 (M.D.N.C. 2016) (internal quotation marks omitted).

99. Defendants were at all relevant times members of the Surry BOE and Stokes BOE persons acting under color of state law, which requires them *inter alia* to follow federal and State law and abide by the policies they adopt. *See generally* N.C. Gen. Stat. § 115C, Art. 5.

100. Superintendent Reeves is the "executive officer" of Surry BOE, and Superintendent Rice is the "executive officer" of Stokes BOE. N.C. Gen. Stat. § 115C-5(8); *see generally id.*, Art. 18.

101. Mr. Wright has a property right to attend meetings and events that are open to the public subject to the restrictions imposed by State law and Board policies.

102. Mr. Wright has a liberty interest in his reputation and his freedom to associate with members of his community at large and participate in community events.

30

103. Mr. Wright has First Amendment rights to speak, assemble, assemble, and petition his government.

104. Defendants violated Mr. Wright's procedural due process rights when they indefinitely banned him from *any* school property, from attending *any* function or event *involving* the Surry or Stokes County Schools, and from speaking with *any* student or staff of the Surry or Stokes County Schools, under threat of criminal prosecution, without providing him notice of allegations of his "recent" conduct upon which the bans were based, without providing him any meaningful opportunity to be heard, or any mechanism for review or reconsideration. The bans are not governed by objective standards and were imposed without any process that included Mr. Wright's participation, creating a substantial risk of erroneous and arbitrary deprivation. As a result, Defendants' actions constitute a violation of Mr. Wright's right to procedural due process.

105. Defendants knew its subordinates had violated Mr. Wright's constitutional rights to freedom of speech, liberty, and property right to attend public meetings and school activities open to the public. Defendants ratified these decisions on February 17, 2026.

106. As a direct result of Defendants' actions, Mr. Wright has suffered significant reputational harm within his community. In the absence of

31

due process and the dissemination of false and inflammatory allegations on social media, many members of the public have come to believe Mr. Wright engaged in serious and inappropriate misconduct involving a minor warranting his complete ban from school properties. His community members are aware of the ban, not only by the posting in the school office, but also by Mr. Wright's noticeable absence from all school events given that Mr. Wright was previously an avid supporter of school athletics and attend all athletic and school events of his grandchildren.

107. Defendants' acts constitute a disregard for, and deliberate indifference to, Mr. Wright's constitutionally protected rights.

## COUNT II

**Violations of the First Amendment**
**Freedom of Speech, Assembly, Association, and Petition**
**U.S. Const. amend. I.**

108. Plaintiff incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

109. To assess a First Amendment claim alleging an unconstitutional restriction of speech, "the court must begin the inquiry by determining whether the plaintiff had engaged in protected speech." *Am. C.L. Union, Student Chapter-Univ. of Md., Coll. Park v. Mote*, 423 F.3d 438, 442 (4th

Cir. 2005). Then, the court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* (quoting *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003)). Lastly, "the court must determine whether the justifications for the exclusion satisfy the requisite standard for that forum." *Mote*, 423 F.3d at 443.

110. The First Amendment protects not only spoken and written words, but also expressive conduct and participation in forums for public discourse. The Constitution protects the right to receive information and ideas. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). "This right to receive information and ideas, regardless of their social worth, *see Winters v. New York*, 333 U.S. 507, 510 (1948), is fundamental to our free society." *Stanley*, at 564.

111. Courts apply an objective inquiry to determine whether government action would deter a person of ordinary firmness from engaging in protected speech. The relevant question is whether "a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

33

112. "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Madison Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167 (1976) (although a State may conduct business in private session, "[w]here the State has opened a forum for direct citizen involvement," exclusions bear a heavy burden of justification.).

113. The First Amendment's Free Speech Clause constrains government regulation of speech on government property through forum analysis. Under this framework, government-controlled property is classified as a traditional public forum, designated public forum, limited public forum, or nonpublic forum, and the applicable level of scrutiny depends on the forum's classification. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983).

114. The Fourth Circuit has consistently applied this framework in school-related settings, including school board meetings and access to school facilities. *See, e.g., Davison v. Rose*, 19 F.4th 626, 635 (4th Cir. 2021) (analyzing school board meetings as limited public fora); *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019) (finding a Board Chair's social

34

media page a public forum as he invited members of the public to comment).

115. School board meetings are recognized as limited public forums, where the government may impose reasonable, viewpoint-neutral restrictions to ensure orderly conduct. *See Rose*, 19 F.4th at 635–36. In such settings, a governing body may be "justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions" to conduct its business, including rules designed to prevent disruption. *Id.* (citing *Steinburg v. Chesterfield Cnty. Planning Com'n*, 527 F.3d 377, 384-85 (4th Cir. 2008)).

116. Consistent with these principles, when the government opens property for public use subject to defined purposes, the space is properly treated as a limited public forum, and restrictions on access must be reasonable and viewpoint neutral. *See Steinburg*, 527 F.3d at 384-85; *Davison*, 912 F.3d at 682.

117. "[T]he government violates the First Amendment when it gives a public official unbounded discretion to decide which speakers may access a traditional public forum." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006) (internal citations omitted); *Child Evangelism Fellowship of S.C. v. Anderson Sch.*

35

*Dist. Five*, 470 F.3d 1062, 1067–71 (4th Cir. 2006) (collecting cases) (analyzing restrictions on waiving usage fees for after-hours access to school facilities).

118. Moreover, in the school-ban context, indefinite and blanket exclusions—particularly those imposed "until further notice"—weigh heavily against reasonableness where they are unsupported by objective criteria, time limits, or review procedures. Such bans function as ongoing restraints on participation in recurring public forums, including athletic events, graduations, and public meetings, without any defined endpoint tied to the forum's purpose. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–59 (1988); *Child Evangelism Fellowship of Md.*, 457 F.3d at 386–89.

119. The indefinite and overbroad nature of Defendants' bans, combined with the absence of objective standards governing their imposition, duration, or removal, vests Defendants with unbridled discretion and excludes Plaintiff from public forums in a manner incompatible with the First Amendment.

120. Under State law, Defendants' official meetings are open to the public, and Defendants' policies specifically invites visitors to attend school events open to the public (e.g., athletic events, musical programs, and

36

dramatic productions). Defendants opened these forums to the public to foster community engagement, facilitate public observation of school operations, and allow citizens to participate in and petition their government.

121. Prior to the institution of the bans, Mr. Wright engaged in activities protected by the First Amendment, including attending school-sponsored athletic events to support his grandchildren and associating with other members of the school community-conduct that conveys support, encouragement, and engagement in matters of public concern. Participation in such forums constitutes protected expressive activity, and the right to access and engage in these settings is an essential component of the freedoms of speech, association, and petition guaranteed by the First Amendment.

122. As a result of these bans, Mr. Wright experiences a non-speculative and objectively reasonable chilling effect on speech as Defendants' letters state "Should you violate the directives contained in this letter, notification to law enforcement officials will be issued immediately, and we shall pursue all available legal remedies, including the issuance of an appropriate criminal warrant or citation." Under threat of criminal prosecution and by the plain language of Defendants' letters, Mr. Wright

37

is barred from attending any Board of Education meetings to challenge his wrongful exclusion, to receive information regarding educational matters, or to petition his government for redress of his grievances.

<strong><u>COUNT III</u></strong><br>
<strong>Violation of the Fourteen Amendment</strong><br>
<strong>Conspiracy to Commit Deprivation of Civil Rights</strong><br>
<strong>42 U.S.C. § 1983</strong>

123. "In a conspiracy claim under Section 1983, there must be a showing that the defendants conspired or acted jointly or in concert and that some overt act was done in furtherance of the conspiracy, which resulted in plaintiff being deprived of the constitutional right." *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992).

124. Plaintiffs are "not required to provide direct evidence of the agreement between conspirators. Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Id.* at 576-77. A "meeting of the minds" can be inferred by circumstantial evidence. *Id.* at 577.

125. "Acquiescence can amount to a conspiracy agreement when, as here, one [public official] watches an open breach of the law and does nothing to seek its prevention." *Id.* at 578.

126. Defendants' Superintendents issued identical letters in September 2022 banning Mr. Wright from attending any school properties, speaking with

38

any students or staff of Defendants' school district, attending any event, wherever located, involving Defendants' school district, and threatening criminal prosecution.

127. On July 2, 2025, Defendants' Superintendents received letters from Mr. Vannoy notifying them of the dismissal of claims against Mr. Wright, the expungement of the criminal record, and requesting the ban be lifted.

128. Shortly thereafter, Defendants' Superintendents and Superintendent Brown conspired to keep the ban in place for all three (3) school districts. Mount Airy City Schools issued Mr. Wright a letter refusing to lift the ban, and Defendants never acknowledged the request.

129. After receiving subsequent communication from the undersigned counsel requesting the bans be lifted and providing additional evidence of the unsubstantiated complaint in September 2022, Defendants responded three (3) months later, and again issued identical letters refusing to rescind, thereby reaffirming and ratifying the bans issued in September 2022.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the judgment of this Court against Defendants as follows:

39

1. Find and declare Defendants violated Mr. Wright's constitutional rights to liberty and property and freedom of speech, assembly, association, and petition in violation of the First Amendment of the United States Constitution;

2. Find and declare Defendants violated 42 U.S.C. § 1983 and infringed on Mr. Wright's constitutional rights under the Fourteenth Amendment to the United States Constitution by denying him due process and conspiring to deprive him of his constitutional rights;

3. Find and declare the Defendants' decision to indefinitely ban Mr. Wright from <u>any</u> campus within the Surry or Stokes County Schools' administrative units, from being present on <u>any</u> public-school property, from attending <u>any</u> function or event involving Surry or Stokes County Schools, and from having any contact or communication whatsoever with any Surry or Stokes County Schools' student or staff member, excluding members of [his] immediate family, until further notification from Defendants' Superintendents exceeded their statutory authority and violated Mr. Wright's constitutional rights;

4. Find and declare Defendants' overbroad and unlawful ban caused and continues to cause Mr. Wright irreparable harm and order Defendants to rescind the ban immediately;

40

5. Find Defendants' decision to ban Mr. Wright and continue to uphold the ban without due process and after receiving evidence the 2020 charges were dismissed and the record expunged, and the 2022 report was unsubstantiated was arbitrary and capricious;

6. Order Defendants to remove any postings of Mr. Wright's image in connection with the bans;

7. Permanently enjoin Defendants from issuing a subsequent ban of Mr. Wright without legal basis and due process to allow Mr. Wright to freely speak, associate, and assemble with others and fully participate in his community to attend school events that are open to the public and attend all Defendants' "official meetings" without fear of criminal prosecution;

8. Order all documents related to the imposition of these bans removed and expunged from Defendants' records;

9. Order Defendants and their subordinate officials to receive comprehensive training on the constitutional protections afforded to the public and to the students and staff in their charge from an outside, independent legal consultant;

10. Order Defendants to reimburse Mr. Wright all costs incurred in litigating this matter including, but not limited to, expert witness fees, depositions, and court costs;

41

11. Award Mr. Wright all attorneys' fees pursuant to § 1988 for all fees incurred in litigating claims raised under § 1983 and the First Amendment;

12. Award Mr. Wright all attorneys' fees incurred in his prior attempts to solicit the removal of the bans without litigation; and

13. Award Plaintiff compensatory damages to compensate for the harm Defendants caused to Mr. Wright, Mr. Wright's family, and Mr. Wright's reputation by banning Mr. Wright from attending any events, being on any property, or speaking to any students or staff of Defendants' school districts beginning September 2022;

14. Award Plaintiff nominal damages;

15. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted, this the 14th day of April, 2026.

/s/ Stacey M. Gahagan
Stacey M. Gahagan
N.C. State Bar No. 44393
3326 Durham Chapel Hill Blvd.,
Suite 210-C
Durham, NC 27707
Telephone: (919) 942-1430
Email: sgahagan@ncgplaw.com